IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

DELLANDO RECARDO CAMPBELL,

*Defendant.*

Criminal Action No. ELH-14-0058

**MEMORANDUM OPINION**

Defendant Dellando Recardo Campbell entered a plea of guilty to the crime of aiding and abetting his friend, Ryan Holness, in fatally stabbing Holness's spouse, Serika Dunkley Holness, in violation of 18 U.S.C. § 2261(a)(1).  He was sentenced to a term of 360 months of imprisonment. ECF 33 (Judgment).

Campbell, who is pro se, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  ECF 61 (the "Motion").  He argues that his sentence should be reduced "in light of the Pandemic, the harsh prison conditions, [his] exceptional record of rehabilitations, his remarkable behavior while in custody, the sentence disparity that exists among defendants and the unusually lengthy sentence imposed."  *Id.* at 1.[1]

The government opposes the Motion (ECF 68, the "Opposition"), supported by several exhibits. It argues that Campbell "does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic," and it also points to "the incredible seriousness of the crime he committed," the danger that defendant presents to the community, the time remaining on defendant's sentence, and other factors under 18 U.S.C. §

---

[1] By letter of August 26, 2021, the Office of the Federal Public Defender ("FPD") declined to represent the defendant.  ECF 63. Thereafter, Campbell filed a motion for appointment of counsel.  ECF 65. I denied the motion by Order of November 1, 2021. ECF 69.

3553(a).  *Id.* at 1.  Campbell has not replied, and the time to do so has expired.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.      Factual Background[2]

On February 4, 2014, Campbell was charged in a one-count Indictment with having "traveled in interstate commerce with the intent to kill and injure" the spouse of Ryan Holness, resulting in a crime of violence against that spouse, *i.e.*, the commission of murder, as defined in 18 U.S.C. § 1111(a), in violation of 18 U.S.C. § 2261(a)(1) and (b)(1). ECF 1. Campbell entered a plea of guilty before Judge William Nickerson, to whom the case was then assigned, on July 28, 2014.  Pursuant to a Plea Agreement (ECF 27), the plea was tendered under Fed. R. Crim. P. 11(c)((1)(C), by which the parties agreed to a sentence of 360 months (30 years).  *Id.* ¶ 8.[3]

The Plea Agreement contained a lengthy stipulation of facts.  *Id.* at 9-19.  According to the stipulation, on June 5, 2009, Serika Holness (the "Victim") was married to Ryan Holness.  *Id.* at 9.[4] The defendant and Ryan Holness knew each other since late 2002 when they served together in the U.S. Navy. *Id.* On November 5, 2008, Holness applied for a $500,000 life insurance policy for the Victim, and Holness designated himself as the sole beneficiary of that policy. *Id.* at 10.

In early June 2009, Holness implemented a plan to murder the Victim during a trip from New York to Maryland and to make the murder appear to have been committed by an unknown carjacker.  *Id.*  Holness planned to commit  the murder with a knife, rather than a firearm, because

---

[2] The case was reassigned to me in October 2020, due to Judge Nickerson's retirement.

[3] Holness was convicted following a jury trial in March 2011.  *See*  Case WMN-09-0611. He was sentenced to life imprisonment.  *Id.*, ECF 103.

[4] The victim was born in 1982.  ECF 27 at 9.  And, the two got married in June 2003.  *Id.*

a knife would support Holness's description of a struggle and would account for the recovery of blood and DNA evidence of the unknown carjacker at the murder scene and from Holness's vehicle, a 2007 Honda. *Id.* at 10. The DNA of an unknown third person was "crucial" to Holness's plan to convince the authorities of the veracity of his account of a fatal carjacking. *Id.*

Holness "required an accomplice to drive the Honda from the scene of the 'carjacking' and to contribute blood and DNA 'evidence'" at the murder scene. *Id.* at 10-11.  Between May and June 4, 2009, Holness contacted the defendant by phone and text "at least 34 times."  *Id.* at 11. Holness arranged for the defendant to travel from Georgia to New York City to assist in the murder of the Victim. *Id.* "On June 4, 2009, Holness stated explicitly to the Defendant that he was going to kill the [V]ictim." *Id.*  And, he told Campbell that he "needed [his] assistance to make the murder appear to have been committed during a carjacking . . . ." *Id.*

On the evening of June 4, 2009, Holness drove the defendant and the Victim from New York to Maryland. *Id.* At around 1:30 a.m. on June 5, 2009, Holness, the defendant, and the Victim arrived at a rural area in Kent County, Maryland. *Id.* Holness parked his car on a farm access road. *Id.* The murder of the Victim occurred in the adjoining field, where the Victim was repeatedly stabbed to death with a knife. *Id.*

The autopsy revealed that the victim suffered eleven stab wounds and several blunt force injuries.  *Id.*  These included injuries to her chest and neck, including one to the left jugular vein and another that severed her thyroid gland and windpipe.  *Id.*

The defendant assisted Holness in staging the crime scene to include blood and DNA "'evidence' contributed by the Defendant." *Id.* at 12. The defendant "conspicuously deposited droplets of his blood at various locations inside the passenger compartment of the Honda and on several of the [V]ictim's personal items that were placed at the crime scene in contemplation of

discovery by the police." *Id.* at 12. The defendant then drove the car to a location in Washington, D.C., where he abandoned the vehicle in a way that would lead to its discovery. *Id.* Homicide detectives located and seized the vehicle on June 5, 2009. *Id.* Defendant left the area by bus. *Id.*

At about 5:30 a.m. on June 5, 2009, after the Victim was murdered, Holness walked to a residence about 500 yards north of the murder scene and told residents there that he and his wife had been carjacked on their way from New Jersey and that his wife was in a nearby field. *Id.* at 13. Police officers responded to that location and found the Victim in a field about 500 yards south of the house. *Id.*

Holness told the officers that he and his wife were carjacked by an unknown assailant with a gun when they stopped at a rest station to purchase gas. *Id.* at 8. Holness was transported to a hospital emergency room at about 6:57 a.m. *Id.* His description of the events did not match his physical condition. *Id.*

Subsequent examination of scrapings from Holness's pant "revealed fragments of what appeared to be 'glittery' blue and pink nail polish." *Id.* at 13-14. Five fragments of blue, red, and yellow nail polish were also recovered from scrapings from Holness's shirt. *Id.* at 14. These scrapings were found to match the nail polish observed on the Victim. *Id.* The medical examiner also noted defensive wounds on the Victim's hands and fingers, several of which were severely sliced. *Id.* Holness was found to be the source of DNA recovered from duct tape inside the car. *Id.* at 16. The vehicle was also observed at the murder scene by an independent witness. *Id.*

DNA of an unknown male, the purported carjacker, was also found in the vehicle. *Id.* at 17. The DNA profile of the unknown male was entered into the national DNA data base, where it was regularly compared to DNA profiles recovered in the interval. *Id.* However, it remained unidentified until late 2013. *Id.* at 17.

On October 22, 2013, a sample of the defendant's DNA was obtained by police in Lemoore, California. *Id.* In January 2014, the California Department of Justice notified the Maryland State Police that the defendant's DNA profile matched that of the unknown male. *Id.* Subsequent testing by the Maryland State Police Crime Lab confirmed that the defendant's DNA profile matched the DNA profile of the unknown male and, specifically, that the defendant was the source of DNA attributed to the unknown male that was recovered from the passenger compartment of the car and from blood recovered from the Victim's purse and sandal. *Id.* The defendant was arrested by the Maryland State Police and the FBI in Lemoore, California on February 7, 2014. *Id.*

Defendant waived his *Miranda* rights and disclosed that Holness solicited the defendant to assist Holness in his "plot" to kill Holness's wife. *Id.* at 17-18. The defendant claimed he was in the car when Holness drove the victim to a farm field, at which point Holness repeatedly assaulted the Victim with a knife. *Id.* at 18. The defendant then drove the car from the murder scene alone, abandoned the car, and took a bus to Georgia. *Id.* Campbell maintained that he did not personally participate in stabbing the Victim. *Id.*

Sentencing was held on November 5, 2014. ECF 31. The defendant was 31 years old at the time. Pursuant to the Amended Presentence Report ("PSR," ECF 32), Campbell had a final offense level of 41 under the U.S. Sentencing Guidelines (U.S.S.G." or "Guidelines"). *Id.* ¶ 38.[5] The PSR noted that defendant had a criminal history category of III. *Id.* ¶ 47. However, Judge Nickerson reduced it to II, based on over-representation. *Id.*; *see also* ECF 34 at 1. But, the change did not affect the calculation of the Guidelines.

The offense carried a maximum term of life imprisonment. *Id.* ¶ 54. The Guidelines called

---

[5] Defendant earned a two-point deduction under U.S.S.G. § 3E1.1(a), but did not earn a third-point deduction under § 3E1.1(b).

for a period of incarceration ranging from 360 months to life. ECF 32 at 13.  In accordance with the C plea, Judge Nickerson sentenced Campbell to 360 months of imprisonment .

The defendant subsequently filed a motion to vacate his sentence, pursuant to 28 U.S.C. § 2255.  ECF 40.  By Memorandum (ECF 50) and Order (ECF 51) of June 29, 2016, Judge Nickerson denied the motion.  Thereafter, Holness noted an appeal.  ECF 52.  The appeal was dismissed by the Fourth Circuit on November 22, 2016. ECF 57.

Campbell has a projected release date of December 18, 2038.  *See Find an Inmate*, BUREAU OF PRISONS, Inmate Locator (bop.gov) (last visited Nov. 15, 2022).  On July 20, 2021, Campbell filed the Motion.  ECF 61.  As noted, he claims that his sentence should be reduced based on his "exceptional record of rehabilitation, his remarkable behavior while in custody, the sentence disparity that exists among defendants and the unusually lengthy sentence imposed . . . ." *Id.* at 1.

## II.  Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th

162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United*

*States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constitutes

a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after

considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are

applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison,
> pursuant to a sentence imposed under section 3559(c), for the offense or offenses
> for which the defendant is currently imprisoned, and a determination has been made
> by the Director of the Bureau of Prisons that the defendant is not a danger to the
> safety of any other person or the community, as provided under section 3142(g);
> and that such a reduction is consistent with applicable policy statements issued by
> the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S.

___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d

181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court

must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2)

the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing

Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction

of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A)

analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to

reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only

if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"

*United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C.

§ 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[6]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also*

---

[6] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply here.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, No. 21-6776, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized."  *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release."  *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what

should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required'" from the court.  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments.  *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release.  Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

Nevertheless, the defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

11

As indicated, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see*

*Jenkins*, 22 F.4th at 167.  And, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### III.  COVID-19[7]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[8]  COVID-19 spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

Some people who are stricken with the coronavirus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.

And, as of November 16, 2022, COVID-19 has infected more than 98 million Americans.  *See*

---

[7] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[8] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed November 16, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). It "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Indeed, for a significant period of time, life as we have known it came to a halt. Businesses and schools were shuttered or operated on a limited basis for quite sometime, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has

repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In October 2022, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (October 19, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk

category." *Id.* at 196.   Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).   However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").   Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").   Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective

equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[9]

---

[9] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

_____

correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

There is currently no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022).  Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age

18 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated October 4, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of October 6, 2022, the BOP had 143,064 federal inmates and approximately 36,000 staff.  And, by that date,

the BOP had administered 330,593 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed October 6, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking cause for concern, because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-

variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021),  https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022),           https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.  And, the country again began to return to normalcy.

Unfortunately, that respite did not last long.  In the spring of 2022, we endured another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should       We       Be?*,       N.Y.       TIMES       (Apr.       7,       2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is   spreading   rapidly   in   the   United   States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.

It now appears that the coronavirus is a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as Once-Hopeful Summer Ends*, N.Y. TIMES (Sept. 5, 2021) https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  Indeed, in an interview on "60 Minutes" in September 2022, President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*

As of November 9, 2022, the BOP reported that 234 federal inmates, out of a total population of 143,064, and 333 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 48,115 inmates and 14,402 staff have recovered from the COVID-19 virus.  In addition, 308 inmates and seven staff members have died from the virus.  The BOP has completed 128,704 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Fairton, where defendant is incarcerated, the BOP reported that as of November 10, 2022, out of a total of 1,666 inmates, one inmate and four staff members have tested positive. One inmate in FCI Fairton has died of COVID-19, and 203 inmates and 156 staff members have recovered at the facility. In addition, 169 staff members and 921 inmates at  FCI Fairton have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, FEDERAL BUREAU OF PRISONS, FCI Fairton (bop.gov) (last visited November 10, 2022).

## IV. Discussion

### A.  Exhaustion

As a threshold issue, it is plain that defendant has exhausted his administrative remedies. As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term

of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. Once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See*, *e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

On June 2, 2021, Campbell submitted a request to the Warden of FCI Fairton, "seeking a sentence reduction due to the following reasons: 1) harsh prison conditions; 2) exceptional rehabillitation [sic]; 3) sentence desparity [sic] among defendants; 4) unusually lengthy sentence." ECF 63-1 at 2.  The Warden denied  Campbell's request for relief on July 22, 2021. *Id.* at 1.

Campbell has satisfactorily pursued his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).

## B.  Extraordinary and Compelling Circumstances

### 1.

Campbell argues that the harsh prison conditions due to the pandemic demonstrate extraordinary and compelling reasons justifying a reduced sentence. ECF 61 at 13.  Specifically, he asserts: "Since the start of the pandemic, Mr. Campbell has yet to visit with his family.  The Court should find this concerning, especially for someone like Mr. Campbell who is already serving a 30 year sentence – *a severe punishment* – and has done everything in his power to establish and maintain strong family ties.  Further, and as indicated above, Mr. Campbell's ability

to continue his educational voyage has diminished due to the pandemic."  ECF 61 at 15 (emphasis in original).

In response, the government points out the "aggressive action" that the BOP has taken to "mitigate the danger of COVID-19.  ECF 68 at 20. This includes screening of inmates and staff, limiting contractor access, establishing quarantine areas within their facilities to house detainees infected with the virus, and limiting social visits and tours.  *Id.* at 21.

The government also notes: "[T]he defendant is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The Motion should therefore be denied." ECF 68 at 28 (citing *United States v. Williams*, No. 10-427, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, No. 14-315-01, 2020 WL 4193055, at *2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, No. 18-00474-1, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, No. 11-251-07, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (same); *United States v. Coles*, 455 F. Supp. 3d 419 (E.D. Mich. 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. 2020) (compassionate release denied for 61-year-old with no medical conditions)).

Additionally, "[t]he defendant has received a vaccine approved by the FDA for emergency use based on its conclusion that, in extensive testing, the vaccine was approximately 95% effective in preventing COVID-19 infection, including in participants with medical comorbidities associated with high risk of severe COVID-19." *Id.* at 29. Therefore, the government asserts that there are no extraordinary and compelling circumstances justifying a reduced sentence.

General hardships due to COVID-19 do not constitute an extraordinary and compelling circumstance that warrants an inmate's release. Judge Chasanow of this Court explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . ., generalized and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

Campbell does not claim to suffer from any underlying medical conditions that would put him at a heightened risk of severe disease if he were to again contract COVID-19. Additionally, given that he is 40 years old (ECF 32 at 1), his age does not put him at a higher risk of severe illness. In light of Campbell's youth and apparent good health, he does not provide a basis for a finding of extraordinary and compelling circumstances that warrant compassionate release.

## 2.

Campbell also argues: "Allowing [his] sentence to remain unchanged precipitates a circumstance of unwarranted sentencing disparity." ECF 61 at 15. He highlights several cases involving defendants who engaged in "worse conduct" and received shorter sentences or had their sentences reduced. *Id.* at 16. *See, e.g., United States v. Rios*, No. 3:94-cr-112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (sentence reduced from three life sentences to 30 years for murder and drug conspiracy convictions); *United States v. Greene*, 516 F. Supp. 3d 1 (D.D.C. 2021) (sentence reduced to time served after serving 49 years for felony murder and armed robbery); *United States v. Bass*, 514 F. Supp. 3d 977 (E.D. Mich.), *rev'd and remanded,* 17 F.4th 629 (6th Cir. 2021).

Further, Campbell asserts: "At the time that [he] was sentenced, it may be that the sentence imposed was appropriate however, in light of the totality of the circumstances that exist today, it

would be reasonable to argue that Mr. Campbell may not have received a 30 year sentence – therefore, Mr. Campbell may be serving an 'unusually lengthy sentence.'" ECF 61 at 19.

The government notes that Campbell's "identification of others who received lesser sentences ignores the numerous individuals who have received comparable sentences." ECF 68 at 39. In support of its assertion, the government points to several cases, including *United States v. Martin*, GLR-13-0677; *United States v. Cruz-Flores*, JKB-17-0589; *United States v. Salmeron-Larios*, PX-16-0444; *United States v. Flores-Ventura*, JKB-18-0070; and *United States v. Portillo-Guiterrez*, JKB-16-0259. According to the government, the defendants in these cases received sentences comparable to the one imposed in this case, based on their involvement in a murder, notwithstanding that they were not convicted of a substantive murder count.

The government also cites *United States v. Whisonant*, ELH-17-0191. *See* ECF 68 at 39. The case involved three defendants. Two defendants pleaded guilty to conspiracy to distribute one kilogram or more of heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime. Another pleaded guilty to the drug conspiracy. The two defendants had different roles in the murder. One defendant alerted a co-defendant of the victim's presence and provided instruction as to the murder itself. *See id.* He received 420 months of incarceration. *Id.* The other defendant shot and killed the victim, and he received 480 months of incarceration. *Id.* The third defendant received 360 months of incarceration after pleading guilty only to conspiracy to distribute one kilogram or more of heroin. *Id.*

Here, Holness received a life sentence. The defendant claims he is not the one who stabbed the victim. His sentence was far more lenient than the one received by Holness.

Although Campbell allegedly did not commit the stabbing, he helped to facilitate the murder.  His sentence reflects his role, and stands in stark contrast to the sentence imposed on Holness.

Campbell agreed to the C plea of a 30-year sentence.  *Id.* at 9. Buyer's remorse is not a basis to reduce Campbell's sentence. Moreover, the government argues that if this Court were to reduce Campbell's sentence, "this would set up a petitioner like this one to seek compassionate release any time another defendant involved in a similar crime received a more lenient sentence." ECF 68 at 41.

## V. Conclusion

Campbell's argument of sentencing disparity fails to persuade this Court that extraordinary and compelling reasons exists to reduce his sentence. There are numerous cases involving defendants who received comparable or greater sentences for similar conduct.  Moreover, compassionate release is not a vehicle for this Court to second guess the sentencing decision of Judge Nickerson.  To do so would flood the docket with similarly situated defendants and, as the government asserts, "would eviscerate the command of sentence finality." *Id.* at 41.

Because Campbell has failed to show an extraordinary and compelling reason for compassionate release, I shall deny the Motion, without prejudice. An Order follows, consistent with this Memorandum Opinion.


Date: November 21, 2022                          _____/s/_____

                                                Ellen L.  Hollander
                                                United States District Judge